UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In Re:

SUGARLEAF TIMBER, LLC

   Debtor.

_____

FARM CREDIT OF FLORIDA, ACA,

   Appellant,

v.            Case No:  3:14-cv-380-J-39
             Bankruptcy No: 3:11-bk-03352-PMG
SUGARLEAF TIMBER, LLC, GARY A.
MILLER, AVERY C. ROBERTS,
RICHARD A. MILLER, FRANK E.
MILLER, A.J. JOHNS, and L. RANDALL
TOWERS,

   Appellees.

_____/

## ORDER

   This case is on appeal from the United States Bankruptcy Court for the Middle District of Florida.  Appellant, Farm Credit of Florida, ACA ("Farm Credit"), seeks review of two Bankruptcy Court Orders that together confirmed a plan of Chapter 11 reorganization.[1]  The principal issue in this appeal is whether the Bankruptcy Court correctly determined that the proposed "dirt-for-debt" swap provides Farm Credit with the

_____

[1] The Bankruptcy Court entered its "Order on Confirmation of Chapter 11 Plan" (hereinafter, "First Order") on November 22, 2013. See (Doc. 1-3).  The Bankruptcy Court entered its "Order Confirming Debtor's Amended Chapter 11 Plan of Reorganization Dated October 31, 2011 as Modified" (hereinafter, "Second Order") on December 20, 2013. See (Doc. 1-4).

"indubitable equivalent" of its claim under the Bankruptcy Code's "cram-down" provision.[2] After careful review, this Court affirms.

## I.    FACTUAL BACKGROUND

The Debtor, Sugarleaf Timber, LLC ("Sugarleaf") was formed in April of 2007 for the purpose of purchasing and developing property. (Transcript of Trial, Doc. 1-84 at 53:16 – 53:20). Sugarleaf is the owner of approximately 7,060 aces of real property in Clay County, Florida (the "Property"), situated just south of Green Cove Springs, in the Jacksonville Metropolitan Service Area, and approximately thirty (30) miles away from downtown Jacksonville, Florida. (Id. at 58:6 – 59:16; 111:12 – 111:15).[3] Sugarleaf financed the purchase of the Property with loans from Farm Credit, evidenced by three promissory notes ("Notes"), all payable in ten (10) years. (Id. at 61:16 – 62:3; 65:8 – 65:24).[4] The Notes are secured by three mortgages on the Property and security interests in much of Sugarleaf's assets. The individual Appellees ("Guarantors") each guaranteed the indebtedness evidenced by the Notes. See, e.g., (Debtors'/Guarantors' Trial Exhibit 18). At the time of purchase, the then-7,981 acres comprising the Property was appraised as having a market value of approximately $41,910,000. (Transcript of Trial, Doc. 1-84 at 66:21 - 68:19).

---

[2] 11 U.S.C. § 1129(b)(1) allows the court to confirm a plan of reorganization despite the objection of a creditor.

[3] The Property is referred to as three separate tracts: (1) the Residential tract, (2) the Gibbs Bay tract, and (3) the Rayonier tract. See, e.g., (Transcript of Trial, Doc. 1-84 at 199:16 – 199:22).

[4] One of the Notes was for $20,450,000 and the two others were each for $5,000,000. (Transcript of Trial, Doc. 1-84 at 65:8 – 65:19); (Farm Credit's Claim, Doc. 1-128).

After acquiring the Property in 2007, Sugarleaf began preparing the Property for development.  Sugarleaf obtained (1) a Formal Wetland Determination from St. Johns River Water Management District on August 5, 2010, which identified the portions of the Property that are developable, see (id. at 72:25 – 73:14) ("[T]his is one of the biggest ticket items that we – you have to have to do a major development of any size."); (2) a Cultural Resource Assessment Survey, which determined that no historically significant sites are located on the Property that would inhibit development, see (id. at 72:1 – 72:24; 213:18 – 214:6) ("[I]f you did not receive this and didn't have this you could run the risk of having some type of historical [sic] significant undertaking on the property that could inhibit your development of it."); and (3) a Phase I Environmental Assessment of the Property, which found little likelihood of environmental concerns on the Property, see (id. at 71:1 – 71:25) ("On a tract of this nature, when you're using it for a higher and better use, you want to make sure that you don't have any environmental issues on the property that could stand in your way later for development of the property.").  Additionally, Sugarleaf obtained a Comprehensive Land Use Plan in August of 2010, which was adopted in Ordinance No. 2010-31 by the Board of County Commissioners of Clay County.  (Id. at 74:11 - 81:1).  The Ordinance provides that designated areas of the Property may be used for rural residential, industrial, and commercial purposes.  (Id. at 78:20 - 79:16).  Significantly, the Ordinance changed the land designation of the Property and gave the owner the ability to develop the property for several different uses.[5]  (Id. at

---

[5] The Ordinance does not allow Sugarleaf to immediately develop, but, as the Guarantors' appraiser, Mr. Roy, testified, the Ordinance "will allow a future purchaser of the property to move quicker to the eventual development of the property because this portion has already been done."  (Transcript of Trial, Doc. 1-84 at 211:13 – 212:21).  Mr.

210:25 – 211:12).   In total, Sugarleaf spent approximately $300,000 to $400,000 to prepare the Property for development.  (Id. at 74:6 - 74:10).

The Bankruptcy Court found that the Property was located in the path of economic and transportation growth.  (First Order, Doc. 1-3 at 12 - 14).  First, the Property's location within the Jacksonville Metropolitan Service Area is a "large economic influence" on the Property.  (Id. at 13).  Second, the Property has a substantial connectivity to the existing and future transportation system in the area.  (Id.).  Further, the Bankruptcy Court found it important that a transportation project known as the "First Coast Outer Beltway" is projected to extend the road system from I-10 to an area just north of the Property.  (Id.).  The First Coast Outer Beltway is an expressway designed to connect I-95 to I-10, running through St. Johns, Clay, and Duval counties.  (Id.).  The northern portion of the First Coast Outer Beltway is already "set in stone," which means that it is fully funded and procurement of a construction contractor is imminent.  (Id.); (Transcript of Trial, Doc. 1-88 at 654:4 – 662:21).  The Bankruptcy Court found that, when completed, the First Coast Outer Beltway will substantially improve access and travel time to the Property.  (First Order, Doc. 1-3 at 13).

Since it purchased the Property, Sugarleaf has sold approximately 900 acres of the Property in various sales, which occurred before and after the commencement of this case.[6]  (Debtors'/Guarantors' Trial Exhibit 9).

_____

Roy testified that he accounted for these aspects of the Ordinance in his appraisal.  (Id. at 212:22 – 212:25).

[6] Sugarleaf originally purchased approximately 7,981 acres.  However, between September 10, 2007 and May 8, 2011, Sugarleaf sold 288.61 acres in sixteen (16) separate sales.  (First Order, Doc. 1-3 at 2).  After commencing the bankruptcy case, Sugarleaf sold approximately 631.26 acres in three (3) additional sales.  (Id.).  Most

Eventually, Sugarleaf defaulted on the repayment of its Notes, and commenced this case in the Bankruptcy Court on May 8, 2011 by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  On August 26, 2011, Farm Credit filed a proof of claim against Sugarleaf (Claim 10-1; "Farm Credit's Claim"), asserting a claim in the amount of $27,310,618.40.  See (Farm Credit's Claim, Doc. 1-128).  On March 1, 2013, Sugarleaf filed its Second Amended and Restated Modification to Amended Chapter 11 Plan of Reorganization dated October 31, 2011 (the "Plan").  See (Doc. 1-55).  The Plan provided for Sugarleaf to choose among three alternatives for Farm Credit's claim, but the cornerstone of the Plan was Sugarleaf's proposed transfer of the Property to Farm Credit in full satisfaction of Farm Credit's claim.[7]  The Plan provided that "[t]he Debtor's tender of the Property . . . shall provide Farm Credit with the indubitable equivalence of and shall fully satisfy all claims of Farm Credit against the Debtor. . . . [U]pon the Debtor's

---

notably, Sugarleaf sold approximately 607 acres to EGEnergy for roughly $3.7 million, which equated to $6,215 per acre.  (Transcript of Trial, Doc. 1-84 at 90:21 – 91:7).

[7] Sugarleaf chose the option that allowed it to retain approximately $550,000, consisting of set aside proceeds from the last sale of property and hunting lease revenues.  See (Doc. 1-81).  In pertinent part, the option provides as follows:

> On the Effective Date, in full satisfaction and extinguishment of Farm Credit's claim and all debts and obligations owed to it by the Debtor . . . the Debtor shall tender to Farm Credit (a) a specialty warranty deed, together with such additional papers and instruments as may be reasonably required for title insurance papers, transferring all of the Debtor's interest . . . in (i) Clay County Property 1 Rayonier Tract and (ii) Clay County Property 2 Gibbs Bay Tract, and (b) all of the Debtor's Cash except for (i) $400,000 of the proceeds from Debtor's sale of 607.23 acres . . . and (ii) the proceeds generated in 2010 and 2011 (the "Existing Hunting Lease Proceeds") from the Debtor's Master Hunting Lease . . . .

(Doc. 1-55 at 2-3) (emphasis in original).

tender of such Property to Farm Credit, each of the Farm Credit Notes shall be deemed to be paid in full and all mortgages and all related security agreements . . . shall be deemed to be released and/or cancelled." (Doc. 1-55 at 3). While Sugarleaf contended that the Property provided Farm Credit with the "indubitable equivalence" of its claim, Farm Credit voted to reject the plan and objected to its confirmation. See (Objection, Doc. 1-44).

The Bankruptcy Court held a five-day trial on March 28-29, April 18-19, and July 15, 2013. The main factual dispute at trial was the market value of the Property on the confirmation date.[8] The Bankruptcy Court heard testimony from three real property appraisers who testified about the Property's highest and best use ("HBU") and its attendant market value. Sugarleaf's appraiser, Heyward Cantrell, valued the Property at $38,840,000. (Transcript of Trial, Doc. 1-86 at 494:18 – 494:24); (First Order, Doc. 1-3 at 7); (Debtors'/Guarantors' Trial Exhibit 7, Doc. 15-4). The Guarantors' appraiser, Michael C. Roy, valued the Property at $30,330,000. (First Order, Doc. 1-3 at 7); (Debtors'/Guarantors' Trial Exhibits 6(a)-(c), Docs. 15-1 – 15-3). Mr. Roy opined that the highest and best use of the Property is for mixed-use development. (Transcript of Trial, Doc. 1-84 at 223:7 – 223:12). Mr. Cantrell opined that the highest and best use of the Property is to hold it as an investment for future re-sale of smaller individual parcels. (Transcript of Trial, Doc. 1-86 at 469:22 – 472:15).[9]   Mr. Cantrell, like Mr. Roy,

---

[8] The parties agreed that all appraisals performed on or about November 30, 2012 were deemed to value the Property as of the date of the final order of confirmation. (Transcript of Trial, Doc. 1-86 at 497:20 – 498:13).

[9] Appellees, who are the Guarantors together with Sugarleaf, contend that Mr. Cantrell determined that the HBU of the Property was "Interim Timber; Transition to Mixed Use." See (Answer Brief of Appellees, Doc. 10 at p. 29). At trial, Mr. Cantrell testified as follows:

acknowledged that the Property has a variety of permissible uses under the Comprehensive Plan approved by Clay County. (Id. at 458:23 – 459:20).

On the other hand, Farm Credit's appraiser, Tyler Nelson, valued the Property at $9,100,000, significantly lower than the other appraisers. (First Order, Doc. 1-3 at 7); (Debtors'/Guarantors' Trial Exhibits 5(a)-(c)). Mr. Nelson opined that the highest and best use of the Property was for timber production and recreational uses. (Transcript of Trial, Doc. 1-88 at 706:8 – 706:14; 715:23 – 716:6; 725:18 – 726:2). Mr. Nelson did not provide a future or potential HBU; he merely determined the current HBU of the Property. (Id. at 707:1 – 708:2). Mr. Nelson believed that determining a future HBU would be too speculative. (Id.). All of the appraisers agreed that determining the HBU is the crux of the appraisal analysis because, if the HBU is wrong, then the appraiser would not be gathering the pertinent data to determine the value of the Property. (Transcript of Trial, Doc. 1-84 at 222:11 – 222:18 (Roy)); (Transcript of Trial, Doc. 1-86 at 479:5 – 479:11 (Cantrell)); (Transcript of Trial, Doc. 1-88 at 756:6 – 756:9 (Nelson)).

The Bankruptcy Court entered its Order on Confirmation of Chapter 11 Plan, which contained its findings of fact and conclusions of law, on November 22, 2013. See generally (First Order, Doc. 1-3). In the First Order, the Bankruptcy Court found that the HBU of the Property was for mixed-use development. (Id. at 8-14). Considering the

---

And then right below here we make our conclusion. And so then we say that we have identified that the highest and best use of the property is as holding the property as an investment for the future resale of smaller individual parcels.

(Transcript of Trial, Doc. 472:7 – 472:12) (emphasis added). The First Order specifically states that "[a]ccording to Cantrell, the highest and best use of the Property is to hold it as an investment for the future re-sale of smaller individual parcels." (First Order, Doc. 1-3 at 9).

Property's HBU, the Bankruptcy Court valued the Property at $30,330,000 and Farm Credit's claim at $25,676,994.78. (Id. at 14-17). The Bankruptcy Court found that Farm Credit would receive a substantial "equity cushion" of $4,653,005 upon receipt of the Property. (Id. at 17-19). Consequently, the Bankruptcy Court concluded that the Property provided Farm Credit with the indubitable equivalence of its claim. (Id.). The Bankruptcy Court entered its Order Confirming Debtor's Amended Chapter 11 Plan of Reorganization Dated October 31, 2011 as Modified, on December 20, 2013, which incorporated the findings of fact contained in the First Order. See generally (Second Order, Doc. 1-4). Farm Credit filed a Notice of Appeal for each Order, and the Bankruptcy Court consolidated the appeals on January 22, 2014. See (Consolidation Order, Doc. 1-9); see also (Doc. 1-10). On January 28, 2014, the Bankruptcy Court stayed the First and Second Order pending appeal. See generally (Stay Order, Doc. 1-11). The Plan has yet to be consummated. See (id.).

On appeal, Farm Credit contends that the Bankruptcy Court erred in holding that Sugarleaf's surrender of the Property provided Farm Credit with the indubitable equivalence of its claim. See (Appellant's Initial Brief, Doc. 5 at 10). In support, Farm Credit argues that the Bankruptcy Court's determination of the Property's HBU and corresponding market value were not sufficiently conservative to comport with the indubitable equivalence standard, the evidence regarding valuation was in dispute, the market for similar properties remains uncertain, and the Bankruptcy Court failed to take into account the full amount of Farm Credit's claim. See (Id. at 13 - 28).[10]

---

[10] Farm Credit also claims that Mr. Roy's testimony should not have been considered by the Bankruptcy Court, pursuant to Federal Rule of Civil Procedure 37. Farm Credit fails to cite a single objection made at trial or an appropriate motion directed

Appellees argue that the Bankruptcy Court's findings of fact regarding highest and best use, market value of the Property, and indubitable equivalence were supported by the evidence and were not clearly erroneous.  (See Answer Brief of Appellees, Doc. 10 at 24).   Additionally, Appellees contend that, even if this Court were to review the Bankruptcy Court's indubitable equivalence finding de novo, this Court should nonetheless affirm.  See (id. at 49).

## II.   STANDARD OF REVIEW

This Court has jurisdiction to hear an appeal from a final judgment entered by the United States Bankruptcy Court.   28 U.S.C. § 158(a).   The Court reviews legal conclusions of the bankruptcy court de novo, but accepts the bankruptcy court's factual findings unless they are clearly erroneous.   Rush v. JLJ Inc. (In re JLJ Inc.), 988 F.2d 1112, 1116 (11th Cir. 1993).   "A finding of fact is clearly erroneous when the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been made."   White v. Waage, 440 B.R. 563, 565 (M.D. Fla. 2010).   When this Court examines the facts adduced at trial, generally it will not disturb the bankruptcy court's credibility determinations.   Kane v. Stewart Tilghman Fox & Bianchi, P.A. (In re Kane), 755 F.3d 1285, 1288 (11th Cir. 2014); Englander v. Mills (In re Englander), 95 F.3d 1028, 1030 (11th Cir. 1996) (requiring the reviewing court to give "due regard to the bankruptcy court's opportunity to judge the credibility of the witnesses.").   The reason for this is that

---

to any portion of Mr. Roy's opinion.  See generally (Appellant's Initial Brief, Doc. 5 at 28 - 30).  As a result, Farm Credit has waived appellate review of this claim.  United States v. Turner, 474 F.3d 1265, 1276 (11th Cir. 2007); see also Valdez v. Feltman (In re Worldwide Web Sys., Inc.), 328 F.3d 1291, 1300 (11th Cir. 2003) ("Our sister circuits similarly have found that failure to raise a claim in bankruptcy court generally constitutes waiver of the claim.").

"only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Cf. Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575 (1985) (discussing the clearly erroneous standard under the Federal Rules of Civil Procedure). Consequently, "when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." Id. The Court reviews mixed findings of law and fact de novo. Kaiser Aerospace & Elecs. Corp. v. Teledyne Indus., Inc. (In re Piper Aircraft Corp.), 244 F.3d 1289, 1295 n.2 (11th Cir. 2001); Bakst v. Marks (In re Marks), 131 B.R. 220, 222 (S.D. Fla. 1991) ("Where an issue raises a mixed question of law and fact, the Court likewise will review the bankruptcy court's determination de novo.").

Initially, the parties dispute whether this Court enjoys plenary review of the Bankruptcy Court's "indubitable equivalence" determination, or whether the Court's review is deferential. See (Appellant's Initial Brief, Doc. 5 at 7); (Answer Brief of Appellees, Doc. 10 at 9). Farm Credit cites Arnold & Baker Farms v. United States (In re Arnold & Baker Farms), 85 F.3d 1415, 1417 (9th Cir. 1996) for the proposition that the "indubitable equivalence" issue is a mixed question of law and fact, reviewable de novo. Appellees rely upon In re James Wilson Associates, 965 F.2d 160, 168 (7th Cir. 1992) in support of their contention that "indubitable equivalence" is a question of fact, reviewable for clear error.

In In re Arnold & Baker Farms, the Debtor petitioned for relief under Chapter 11 and filed a plan of reorganization which proposed to satisfy the claims of the creditors by

transferring real property to them. Id. at 1417. When Arnold and Baker's largest creditor objected to the plan, Arnold and Baker invoked the Bankruptcy Code's cram-down provision. Id. The question before the court was whether the plan's proposed transfer of a portion of the collateral securing the creditor's claim provided the creditor with the "indubitable equivalence" of its claim. Id. The bankruptcy court confirmed the plan, but the Bankruptcy Appellate Panel reversed. On appeal, the Ninth Circuit affirmed the decision of the Bankruptcy Appellate Panel, and stated as follows:

> As an initial matter, we must address the appropriate standard of review of such a determination. Arnold and Baker argues that the question of indubitable equivalence is a question of fact to be reviewed under the clearly erroneous standard. We disagree. Although the value of the land is a finding of fact which we review for clear error, the ultimate conclusion of indubitable equivalence is a question of law which we review de novo because it requires analysis of the meaning of the statutory language in the context of the Bankruptcy Code's "cram down" scheme.

Id. at 1421. The Ninth Circuit concluded that the bankruptcy court's valuation in the case was not clearly erroneous, but the court was "not convinced that its finding regarding the value of the real property provided the indubitable equivalence of the particular secured claim in question." Id. at 1422 ("We must decide, therefore, whether a distribution of land with an estimated value of $4,135,450 constitutes the indubitable equivalent of a $3,837,618 claim secured by 1,320 acres. Under the circumstances of this case, we conclude that it does not."). Thus, the Ninth Circuit in In re Arnold & Baker Farms engaged in a two-part inquiry. First, the court reviewed the bankruptcy court's valuation as a finding of fact and determined whether it was clearly erroneous. Second, the court reviewed the ultimate conclusion of indubitable equivalence de novo, as a question of law.

Appellees urge that Court to review the "indubitable equivalence" determination for clear error, citing In re James Wilson Associates, which stated as follows:

> [T]he question whether the interest received by a secured creditor under a plan of reorganization is the indubitable equivalent of his lien is one of fact . . . and our review is therefore deferential.

965 F.2d at 172 (citing Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir.1986)); [11] see B.M. Brite v. Sun Country Dev. Inc. (In re Sun Country Dev., Inc.), 764 F.2d 406, 409 (5th Cir. 1985) (affirming the bankruptcy court's determination that a debtor had provided a creditor with the indubitable equivalent of its claim within the meaning of 11 U.S.C. § 1129(b)(2)(A)(iii), and stating "[t]o the extent that [the creditor] attacks the findings of the bankruptcy court, we reject his complaints, as the findings were supported by the evidence."); Affiliated Nat'l Bank v. TMA Assocs.,

---

[11] Other courts have recognized this split of authority:

> The bankruptcy court's determination of whether the Creditor Group receives the indubitable equivalent of its secured claims under the plan is a mixed question of law and fact. See Arnold & Baker Farms v. United States (In re Arnold & Baker Farms), 85 F.3d 1415, 1421 (9th Cir.1996), cert. denied, 519 U.S. 1054, 117 S.Ct. 681, 136 L.Ed.2d 607 (1997). Although the underlying facts for such a determination are reviewed under the clearly erroneous standard, "the ultimate conclusion of indubitable equivalence is a question of law which we review de novo because it requires analysis of the meaning of the statutory language in the context of the Bankruptcy Code's 'cram down' scheme." Id. (citing Woods v. Pine Mountain, Ltd. (In re Pine Mountain, Ltd.), 80 B.R. 171, 172 (9th Cir. BAP 1987)). But see In re James Wilson Assocs., 965 F.2d 160, 172 (7th Cir.1992) (reviewing indubitable equivalence determination under clearly erroneous standard).

Sunflower Racing, Inc. v. Mid-Continent Racing & Gaming Co. I (In re Sunflower Racing, Inc.), 226 B.R. 673, 687 (D. Kan. 1998).

Ltd. (In re TMA Assocs., Ltd.), 160 B.R. 172, 174 (D. Colo. 1993) (concluding that the Magistrate Judge erroneously reviewed de novo whether a Chapter 11 plan provided a creditor with the indubitable equivalence of its claim, reviewing the bankruptcy court's determination for clear error, and affirming the confirmation order while stating "[t]here is no implication that the confirmation order was entered with anything other than a full appreciation of the facts and circumstances underlying [the debtor's] plan.").[12]

While the Eleventh Circuit has not yet addressed the standard of review for a finding of "indubitable equivalence" in the context of plan confirmation, the term "indubitable equivalent" is used twice in the Bankruptcy Code — once in the Code's cram-down provision, see 11 U.S.C. § 1129(b)(2)(A)(iii), and once in the adequate protection statute, see 11 U.S.C. § 361(3) (stating that, when adequate protection is required, such protection may be provided by "granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property."). The Eleventh Circuit has held that the proper standard of review of a bankruptcy court's finding of adequate protection is clear error. Chrysler Credit Corp. v. Ruggiere (In re George Ruggiere Chrysler-Plymouth, Inc.), 727 F.2d 1017, 1019 (11th Cir. 1984) ("[T]he finding that there was adequate protection will not be overturned unless clearly erroneous."); accord Martin v. United States (In re Martin), 761 F.2d 472, 474 (8th Cir. 1985) ("Upon reviewing the legislative history, we agree with the line of cases that have held that adequate protection is a question of fact."); see also MBank Dallas, N.A. v.

---

[12] See also Daniel A. Austin, Eat My Dirt! Dirt-for-Debt Swaps Under 11 U.S.C. § 1129(b)(2)(a)(III), 23 Am. Bankr. Inst. J. 12 (2003) (noting that "[t]here is a split in the circuits as to whether valuation is a question of law or fact," but that "[t]he Ninth Circuit rule [announced by In re Arnold & Baker Farms] appears to be a minority view.").

O'Connor (In re O'Connor), 808 F.2d 1393, 1397 (10th Cir. 1987) (citing In re George Ruggiere Chrysler-Plymouth, Inc., 727 F.2d 1017) ("Since 'value' is the linchpin of adequate protection, and since value is a function of many factual variables, it logically follows that adequate protection is a question of fact."); In re Snowshoe Co., Inc., 789 F.2d at 1088 ("[A] judicial determination of such adequate protection is a question of fact rooted in measurements of value and the credibility of witnesses . . . . Therefore, unless the district court's conclusion was 'clearly erroneous,' its decision that Shenandoah was adequately protected must be affirmed.").

Appellees argue that "the term 'indubitable equivalent' has the same meaning in both statutes and requires the same result—a determination that a secured creditor is not in jeopardy of losing what it bargained for: the unquestionable value of its collateral." (Answer Brief of Appellees, Doc. 10 at 11).  From this premise, Appellees maintain that the standard of review for a bankruptcy court's finding of indubitable equivalence in the plan confirmation context should be the same as in the context of adequate protection. (Id.).  This argument does indeed find support in Eleventh Circuit case law.  See United States v. Ala., No. 14-11298, 2015 WL 570978, at *7 (11th Cir. Feb. 12, 2015) ("Where Congress has used 'identical words ... in different parts of the same act,' we presume that in each instance the phrase is 'intended to have the same meaning.'" (citation omitted)); Myers v. TooJay's Mgmt. Corp., 640 F.3d 1278, 1285 (11th Cir. 2011) ("[I]t would be illogical to read the identical language in two successive subsections to have different meanings."); United States v. Perez, 443 F.3d 772, 781 (11th Cir. 2006) ("[I]t is a well-established canon of statutory interpretation that identical words used in the same statute are intended to have the same meaning."); Jackson v. State Bd. of Pardons & Paroles,

331 F.3d 790, 795 (11th Cir. 2003) ("Normally, identical words that appear in various parts of the same act are meant to have the same meaning.").

The Court sees no reason that a different standard of review would apply to the Bankruptcy Court's indubitable equivalence determination simply because it was made in the plan confirmation context, as opposed to the context of adequate protection.  Like the determination of adequate protection, the determination of whether a reorganization plan is fair and equitable is a fact intensive inquiry, sounding in value and requiring deference to the Bankruptcy Court's resolution of factual and credibility disputes.  In re James Wilson Associates, 965 F.2d at 172; see In re TMA Associates, Ltd., 160 B.R. at 175. Cf. In re George Ruggiere Chrysler-Plymouth, Inc., 727 F.2d at 1019 (stating that a finding of adequate protection will not be overruled unless clearly erroneous).  As such, the Court will review the Bankruptcy Court's determination that the Plan provides Farm Credit with the indubitable equivalence of its claim for clear error.

## III.   DISCUSSION

Generally, for a Bankruptcy Court to confirm a plan of Chapter 11 reorganization, all of the requirements of 11 U.S.C. § 1129(a) must be met.  Section 1129(a)(8) provides that, with respect to each class of claims or interests, "(A) such class has accepted the plan; or (B) such class is not impaired under the plan."  11 U.S.C. § 1129(a)(8).  Here, Class 1 of Sugarleaf's Plan consists of the secured claim of Farm Credit.  It is undisputed that the claim is impaired, and that Farm Credit rejected the Plan.  Therefore, Section 1129(a)(8) is not met.

Nevertheless, Section 1129(b)(1) provides that "if all of the applicable requirements of [Section 1129(a)] other than paragraph (8) are met with respect to a plan,

the court, on request of the proponent of the plan, shall confirm the plan . . . if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1) (emphasis added). "Section 1129(b) is the so-called 'cram-down' provision of Chapter 11" that permits confirmation of a plan, under certain circumstances, notwithstanding the objection of an impaired class. In re Riddle, 444 B.R. 681, 684 (Bankr. N.D. Ga. 2011) (holding that a "dirt-for-debt" swap in the debtor's proposed Chapter 11 plan provided a secured creditor with the "indubitable equivalent" of its claim and was therefore confirmable); In re May, 174 B.R. 832, 838 (Bankr. S.D. Ga. 1994) (holding that a partial "dirt-for-debt" swap provided the creditor with the indubitable equivalent of its claim). With regard to a class of secured claims, Section 1129(b)(2)(A) provides that "the condition that a plan be fair and equitable" requires that the Plan provide one of three alternatives. 11 U.S.C. § 1129(b)(2)(A)(i)-(iii). One of those alternatives is that the Plan provides "for the realization by such holders of the indubitable equivalent of such claims." 11 U.S.C. § 1129(b)(2)(A)(iii) (emphasis added).

Determining whether an asset provides a creditor with the "indubitable equivalence," of its claim necessarily requires the Bankruptcy Court to resolve conflicting evidence and make credibility determinations in order to value the asset. See In re Atlanta S. Bus. Park, Ltd., 173 B.R. 444, 450 (Bankr. N.D. Ga. 1994) ("[T]he Court concludes that it has the authority under 11 U.S.C. § 506(a) to value the property for the purpose of 11 U.S.C. § 1129(b)(2)(A)(iii) . . . ."). In doing so, courts utilize Section 506(a) of the Bankruptcy Code, and value assets on a case-by-case basis, taking into account the facts of each case and the competing interests. 11 U.S.C. § 506(a) ("Such value shall be

determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest."); see In re Ponce de Leon, 1403, Inc., No. 11-07920 ESL, 2014 WL 6685381, at *38 (Bankr. D.P.R. Nov. 25, 2014) ("Irrespective of whether the proposed chapter 11 plan is a full or partial 'dirt-for-debt' plan, it ultimately becomes a valuation issue which bankruptcy courts have addressed on a case-by case basis.").

Congress derived the nomenclature "indubitable equivalent" from Judge Learned Hand's opinion in Metropolitan Life Insurance Corp. v. Murel Holding Corp. (In re Murel Holding Corp.), 75 F.2d 941 (2d Cir. 1935).  See S. Rep. No. 95-989, at 127 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5913 ("The indubitable equivalent language is intended to follow the strict approach taken by Judge Learned Hand in In re Murel Holding Corp., 75 F.2d 941 (2d Cir. 1935)."); H.R. Rep. No. 95-595 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6475 ("The standard of indubitable equivalence is taken from In re Murel Holding Corp., 75 F.2d 941 (2d Cir. 1935) (Learned Hand, Jr.)").  In In re Murel, the debtor owned an apartment building in the borough of Manhattan. 75 F.2d at 941.  The property was valued at $540,000, but was subject to liens in the amount of $500,000. Id. at 942.  Under the debtor's proposed plan, interest, but no principal, would be paid for ten years.  Id.  The creditor refused to consider the plan.  Id.  In discussing the notion of "adequate protection" for the realization of the full value a creditor's claim, the court stated as follows:

> It is plain that "adequate protection" must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who

> fears the safety of his principal will scarcely be content with
> that; he wishes to get his money or at least the property. We
> see no reason to suppose that the statute was intended to
> deprive him of that in the interest of junior holders, unless by
> a substitute of the most indubitable equivalence.

Id.  In In re Murel, the plan made no provision for the amortization of principal or for

maintenance of the collateral over the ten-year term. Id. at 942-43.  As such, the court

refused to confirm the "wholly speculative" plan, as the creditor would receive neither

money nor property, nor would it receive an equivalent substitute.  Id. at 943.  The

"indubitable equivalence" standard is not discussed further in In re Murel, and the case is

of little assistance to the factual scenario presented here.  Indeed, Sugarleaf proposes to

transfer the Property to Farm Credit in full satisfaction of its claim, not merely pay the

interest thereon.

Nevertheless, subsequent case law has established that this type of "dirt-for-debt"

provision may, under appropriate circumstances, provide the "indubitable equivalence" of

the creditor's claim.  See Sandy Ridge Dev. Corp. v. La. Nat'l Bank (In re Sandy Ridge

Dev. Corp.), 881 F.2d 1346, 1354 (5th Cir. 1989), reh'g denied 889 F.2d 663 ("[W]e have

held that distribution of estate property, at values properly fixed by the bankruptcy court,

to nonconsenting creditors under a liquidating reorganization is not per se categorically

prohibited as a matter of law under Chapter 11 of the Bankruptcy Code . . . ."); see also

In re Atlanta S. Bus. Park, Ltd., 173 B.R. 444; In re Riddle, 444 B.R. 681; In re May, 174

B.R. 832.  In order to qualify as the "indubitable equivalent" of its claim, "the treatment

must be completely compensatory."  In re Riddle, 444 B.R. at 685.  In this regard, some

courts have stated that an equivalent is "indubitable" if "no reasonable doubt exists that

the creditor will be paid in full."  Id.; In re Freymiller Trucking, Inc., 190 B.R. 913, 915-16

(Bankr. W.D. Okla. 1996) ("One might say, therefore, that the evidence of the requisite

indubitable equivalent is present if, under the treatment proposed in the plan, there is no reasonable doubt but that the bank will receive the full value of what it bargained for when it made the contract with the debtor.").

The parties dispute whether this is one of those appropriate circumstances that is completely compensatory. In evaluating the conflicting evidence presented by the parties and their experts during the five-day trial, the Bankruptcy Court found that (1) the highest and best use of the Property is for mixed-use development; (2) the fair market value of the Property is $30,330,000; and (3) "the value of the Property is sufficient to ensure that Farm Credit's secured claim will not be jeopardized, and that Farm Credit will realize the value of its claim." Upon review, the Court holds that these findings were not clearly erroneous.

### A.     The Bankruptcy Court's Factual Findings of the Property's Highest and Best Use and Attendant Market Value were not Clearly Erroneous.

Farm Credit contends that "[b]ecause there was conflicting, credible valuation evidence presented by three appraisers," this Court should reject the Bankruptcy Court's indubitable equivalence determination. (Appellant's Initial Brief, Doc. 5 at 12 - 13). In support of this contention, Farm Credit argues that (i) the valuation evidence was heavily disputed, (ii) the Bankruptcy Court's valuation was not "conservative," and (iii) the market for large undeveloped tracts remains uncertain. (Id. at 13 – 23).[13] Appellees counter that the Bankruptcy Court's findings regarding highest and best use and market value of the

---

[13] Farm Credit further argues that the Bankruptcy Court's HBU determination is not conservative, the Debtor's site preparations are inadequate, the Bankruptcy Court's conclusion that the Property is in an area of economic and transportation growth is erroneous, and the disparity in the expert appraisers' conclusions prevent an indubitable equivalent determination. (Reply Brief of Appellant, Doc. 13 at 11 – 20).

Property were not clearly erroneous.  (Answer Brief of Appellees, Doc. 10 at 28 – 36).

The Court agrees with Appellees.

Courts generally agree that, in dirt-for-debt plans, the Bankruptcy Court's valuation of the property must be "conservative."  See, e.g., In re Atlanta S. Bus. Park, Ltd., 173 B.R. at 450 ("[T]he valuation process needed to be conservative."); In re Riddle, 444 B.R. at 685 ("[T]he court must take a conservative approach to valuation of the collateral in order to protect the secured creditor.").  The reason is that the Debtors have, in effect, shifted the risk of loss to the creditor.  Additionally, the creditor will not be earning interest on the claim until such time as the property is sold or otherwise converted into cash.  Thus, a conservative valuation ensures that the creditor receives the "indubitable equivalent" of its claim.  However, aside from the very general notion that the valuation must be "conservative," courts have formulated different approaches to determining the conservative value of property.  Compare In re SUD Properties, Inc., No. 11-03833-8-RDD, 2011 WL 5909648, at *6 (Bankr. E.D.N.C. Aug. 23, 2011) (engaging in a formal three-part analysis, and stating "the court recognized that the fair market value of the property 'must be discounted to reflect[] the time each property will remain unsold, the cost to [the creditor] of retaining an illiquid investment during this time, and the risk inherent in this transaction.'" (citation omitted)), and In re Riddle, 444 B.R. at 685 (utilizing a "fire sale" valuation), with In re Simons, 113 B.R. 942, 948 (Bankr. W.D. Tex. 1990) (valuing property at liquidation value), and In re Stockbridge Properties I, Ltd., 141 B.R. 469, 472 (Bankr. N.D. Ga. 1992) (stating that "[t]he court finds that the most appropriate method for valuing the outparcels is fair market value," but deducting reasonable holding and marketing costs).  The Court agrees with those courts that have observed that

"[v]aluation is not an exact science, and the chance for error always exists." In re Bannerman Holdings, LLC, No. BKR. 10-01053-SWH, 2010 WL 4260003, at *4 (Bankr. E.D.N.C. Oct. 20, 2010) (citation omitted).   Nevertheless, "property should be valued according to the highest and best use of the property that is reasonably available." In re Stockbridge Properties I, Ltd., 141 B.R. at 471.   A property's highest and best use is that use which is "reasonably available that will result in the highest realized value."   Id.[14]

In the instant case, the Bankruptcy Court was faced with three competing appraisals.   The first was by Farm Credit's appraiser, Tyler Nelson, who valued the Property at $9,100,000.   (Debtors'/Guarantors' Trial Exhibits 5(a)-(c)).   His appraisal was divided into three parts: (1) the Gibbs Bay Property at $1,025 per acre, (Transcript of Trial, 1-88 at 714:19 – 714:22), (2) the Rayonier property at $1,400 per acre, (id. at 721:18 – 721:23), and (3) the Residential property at $2,600 per acre, (id. at 725:18 – 729:5).   Mr. Nelson's appraisal was based on his opinion that the highest and best use of the Property was for timber production and recreational uses.   (Id. at 725:17 – 726:2).   Significantly,

---

[14] Farm Credit argues that the converse of the United States Supreme Court's decision in Associates Commercial Corp. v. Rash, 520 U.S. 953 (1997) should apply here, and that the Bankruptcy Court should have used a valuation akin to foreclosure or liquidation value. (Appellant's Initial Brief, Doc. 5 at 23). However, Rash is inapplicable. Rash involved Chapter 13 debtors who, over the secured creditor's objection, proposed to retain a tractor used in their freight-hauling business and pay the creditor over a period of time the present value of the tractor. 520 U.S. at 957. The creditor and the debtors urged different valuation benchmarks. The debtor urged a foreclosure value; the creditor a replacement value. Id. The Supreme Court held that replacement value applies when a Chapter 13 debtor seeks to retain collateral over the objection of a secured creditor. Id. at 965. Rash's narrow holding is inapplicable in the "dirt-for-debt" context under Chapter 11, where the Debtor proposes to surrender property, not to retain it. See generally David S. Jennis & Kathleen L. DiSanto, Standards of Value in "Dirt-for-Debt" Chapter 11s Don't Make A Rash Decision, Am. Bankr. Inst. J. at 48, 49 (2012) ("To interpret Rash as mandating a liquidation standard in dirt-for-debt cases would turn the holding on its head by providing a windfall to secured creditors to the detriment of unsecured creditors and other constituencies in the case.").

Mr. Nelson did not provide a future or potential HBU, as he believed one to be too speculative.  (Id. at 707:13 – 707:22).

The second appraisal was from Sugarleaf's appraiser, Heyward Cantrell, who valued the Property at $38,840,000.  (Debtors'/Guarantors' Trial Exhibit 7, Doc. 15-4). Mr. Cantrell opined that the highest and best use of the Property is to hold it as an investment for future re-sale of smaller individual parcels.  (Id. at 22).  Mr. Cantrell testified that the Property would most likely sell for $5,500 per acre "to someone who had a vision of land investing in North Florida."  (Transcript of Trial, Doc. 1-86 at 495:6 – 495:19).  Mr. Cantrell stated that he had "high confidence" in his appraisal, and that "if the property was conveyed to Farm Credit or somebody who was going to sell it, it would take 18, 24 months," for someone to close on the Property.  (Id.).

The third appraisal was by the Guarantors' appraiser, Michael C. Roy, who valued the Property at $30,330,000.  (Debtors'/Guarantors' Trial Exhibits 6(a)-6(c)).  Mr. Roy opined that the highest and best use of the Property's is for mixed-use development.  He also opined that the Gibbs Bay and Rayonier properties had a value of approximately $4,250 per acre, (Transcript of Trial, Doc. 1-84 at 244:7 – 249:24); (Debtors'/Guarantors' Trial Exhibit 6(b), Doc. 15-2 at 60); (Debtors'/Guarantors' Trial Exhibit 6(c), Doc. 15-3 at 58), and that the Residential property had a value of $5,000 per acre.  (Transcript of Trial, Doc. 1-84 at 260:24 – 262:5); (Debtors'/Guarantors' Trial Exhibit 6(a), Doc. 15-1 at 53).

The Bankruptcy Court rejected the notion that the highest and best use of the Property is for timber production, and concluded that "the highest and best use of the Property is for mixed-use development."  (First Order, Doc. 1-3 at 10).  The Bankruptcy Court stated that the "reasonably probable and legal use" of the Property "is for mixed-

use development primarily because (1) the Debtor has obtained certain site preparation determinations that are required for the development process; and because (2) the Property is located in the path of economic and transportation growth." (Id.). Thus, the Bankruptcy Court adopted Mr. Roy's determination that the Property had a value of $30,330,000 because it was "based on the sales comparison approach as the recognized method of appraising unimproved property, and because it accounts for the highest and best use of the Property as mixed-use development." (Id. at 17).

The Bankruptcy Court found that Mr. Nelson's valuation was not premised on uses "reasonably available that will result in the highest realized value," In re Stockbridge Properties I, Ltd., 141 B.R. at 471, but instead on a determination that the Property's current interim use for timber production is the Property's highest and best use in perpetuity. (First Order, Doc. 1-3 at 10) ("Nelson's consideration of the Property primarily as timber land reflects a 'current' highest and best use determination for the Property, and not a 'potential future' highest and best use determination."). Farm Credit argues that the Bankruptcy Court's HBU determination and attendant market value was too speculative and not conservative enough because "[a] conservative approach would have recognized the mistakes, inconsistencies and flaws in Mr. Roy's analysis." (Appellant's Initial Brief, Doc. 5 at 20). The Court declines Farm Credit's invitation to re-weigh the evidence and reach new conclusions in the face of substantial evidence to support those of the Bankruptcy Court. Here, after determining that the Property's HBU must encompass "reasonably available" uses, the Bankruptcy Court was tasked with deciding between the appraisals of Mr. Cantrell ($38,840,000) and Mr. Roy ($30,330,000), the only appraisals that considered "reasonably available" uses aside from the Property's interim

use.   The Bankruptcy Court chose the most conservative option, and adopted the valuation of Mr. Roy.[15]   Contrary to Farm Credit's position that a formal discount rate should apply on top of a conservative valuation, (Appellant's Initial Brief, Doc. 5 at 26 - 27), the Bankruptcy Court was not required to strictly apply a formal discount rate of 18-20% of the Property's fair market value.  See In re Stockbridge Properties I, Ltd., 141 B.R. at 472 (applying a fair market valuation without using formal "discounts"); see also In re Atlanta S. Bus. Park, Ltd., 173 B.R. at 451 n.5 ("On this issue, the Court points out that it would be inappropriate to value conservatively the property and require the Debtor to provide a margin of error of, for example, thirty percent." (emphasis in original)).  Rather, the Bankruptcy Court was required to value the Property conservatively, which the evidence reflects it did.  See In re Stockbridge Properties I, Ltd., 141 B.R. at 472 ("Even though the court values property by looking to the secured creditor's options regarding disposition, the creditor is not entitled to a valuation based on a sale of the property under conditions imposed by the creditor that would substantially diminish the amount realized.").[16]

---

[15] To the degree to which Farm Credit contends that the disparity in the expert appraisers' conclusions prevent an indubitable equivalence determination, (Reply Brief of Appellant, Doc. 13 at 18 – 20), the Court rejects that argument.  As Appellees point out, under Farm Credit's rationale, a Bankruptcy Court could never be able to find indubitable equivalence when the value of an asset is subject to two or more conflicting appraisals — even when one of which is a low-ball appraisal proffered by the creditor.  Courts have already implicitly rejected what the Court here explicitly does.  See In re Atlanta S. Bus. Park, Ltd., 173 B.R. at 450 (finding indubitable equivalence despite the fact that the appraisal offered by the Debtor was over $2,100,000, and the appraisal offered by the bank was $710,000).

[16] The Court is cognizant that Farm Credit will have the ultimate choice of the method of disposing of the Property.  However, Farm Credit elects the method at its own risk.  It "may not elect a lesser use than highest and best, realize less on the disposition and impose on the debtor and its estate an artificially low price or forced diminishment in the value of the collateral."  In re Stockbridge Properties I, Ltd., 141 B.R. at 472.

In fact, as Appellees note, Sugarleaf has already begun the process of transitioning the Property to its HBU by preparing the Property for development and selling smaller tracts for multiple uses.  In this regard, the Bankruptcy Court's valuation is consistent with how current market participants are utilizing the Property.  After this bankruptcy case commenced, Sugarleaf sold approximately 607 acres to EGEnergy for roughly $3.7 million, which equated to $6,215 per acre.  (Transcript of Trial, Doc. 1-84 at 90:21 – 91:7); (Debtors'/Guarantors' Trial Exhibit 9).  In other words, the per-acre value of the sale was significantly higher than every appraisal presented to the Bankruptcy Court, as well as the pre-acre value that the Bankruptcy Court ultimately accepted.  See In re Atlanta S. Bus. Park, Ltd., 173 B.R. at 451 ("As evidence of this conservative valuation, the Court points out, as has the Debtor in its brief, that the per acre value placed upon the property is less than that received upon every sale of property inside the industrial park, except for one tract which was disadvantaged by poor topography.").  Moreover, Sugarleaf has also consummated a number of other sales of small parcels for amounts in excess of $5,000 per acre, which is above the valuation adopted by the Bankruptcy Court.  See (Debtors'/Guarantors' Trial Exhibit 9); (Transcript of Trial, Doc. 1-84 at 217:10 – 218:19).  The Court further notes that, despite the economic downturn of 2008, Farm Credit itself valued the Property at $24,000,000 in 2009.  (Debtors'/Guarantors' Trial Exhibit 38).  Indeed, the record reflects that in 2010 another appraisal was conducted on the Property at the behest of Farm Credit in connection with Sugarleaf's attempt to restructure its loans, (Debtors'/Guarantors' Trial Exhibit 4); (Debtors'/Guarantors' Trial Exhibit 61), and there, the Property was found to have a per-acre value of $4,000, for a total value of $31,000,000.  (Debtors'/Guarantors' Trial Exhibit 4 at 64); (Transcript of Trial, Doc. 1-84

at 98:23 – 99:15). Evidence introduced at trial showed that the difficulties that the market faced in 2008 – 2010 have since considerably improved. See, e.g., (Transcript of Trial, Doc. 1-86 at 448:11 – 449:15) ("The market is not only stable but is increasing now in value."). "When two appraisal reports conflict, a court 'must determine the value based on the credibility of the appraisers, the logic of their analysis, and the persuasiveness of their subjective reasoning.'" In re Atlanta S. Bus. Park, Ltd., 173 B.R. at 450. At the end of the day, the Bankruptcy Court's valuation came down to comparing the professional judgment of Mr. Roy, Mr. Cantrell, and Mr. Nelson. After doing so, the Bankruptcy Court found Mr. Roy more convincing. The Bankruptcy Court did not clearly err in this regard.

Additionally, to the degree to which Farm Credit asks this Court to determine whether the Debtor's site preparations were adequate or whether the Property is in indeed in an area of economic and transportation growth, the Court will not review those factual determinations anew. White, 440 B.R. at 565 ("A finding of fact is clearly erroneous when the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been made."). On the entire record, the Court is not left with the definite and firm conviction that a mistake was made. As such, the Bankruptcy Court's findings in this respect were not clearly erroneous.

**B.    The Bankruptcy Court's Finding that the Equity Cushion in the Property Provided Farm Credit with the Indubitable Equivalent of its Claim was not Clearly Erroneous.**

At trial, Farm Credit represented that it was owed approximately $26,000,000. (Transcript of Trial, Doc. 1-84 at 31:15 – 31:22). Farm Credit's claim consisted of the following: (1) the principal balance of the notes; (2) accrued interest; (3) late charges; and (4) attorneys' fees and costs through March 14, 2013. (Farm Credit's Trial Exhibit 161);

(Appendix, Doc.11-11).   Utilizing the Property's fair market value of \$30,330,000, and Farm Credit's total claim of \$25,676,994.78, the Bankruptcy Court found that, upon receipt of the Property, Farm Credit will receive a substantial equity cushion of approximately \$4,653,005.  (First Order, Doc. 1-3 at 17-19).  Considering the evidence, the Bankruptcy Court found that "[t]he value of the equity gives Farm Credit a significant amount of time to realize the value of the property."  (Id. at 19).  As such, the Bankruptcy Court found that "the value of the Property is sufficient to ensure that Farm Credit's secured claim will not be jeopardized, and that Farm Credit will realize the value of its claim."  (Id.).  The Bankruptcy Court concluded that "there is no reasonable doubt that Farm Credit's claim will be paid in full pursuant to the transfer of the Property pursuant to the Plan."  (Id.).

Farm Credit first argues that the Bankruptcy Court failed to take into account the costs of holding and selling the Property in making its indubitable equivalent finding. (Appellant's Initial Brief, Doc. 5 at 23 – 26).  Appellees contend that (a) evidence introduced at trial demonstrates that Farm Credit's costs of liquidating the Property will be approximately eight (8) percent, and (b) Mr. Roy's valuation was premised on the sale of the Property to a single purchaser in 12 to 18 months.  (Answer Brief of Appellees, Doc. 10 at 36 – 38).

Three cases from Bankruptcy Courts in the Eleventh Circuit are instructive.  First, in In re May, the debtor filed a petition under Chapter 11 of the Bankruptcy Code.  174 B.R. at 834.  The debtor had executed a note in favor of a creditor in the principal amount of \$600,000, which was secured by a first priority security interest in eighteen duplex units, fourteen of which the debtor owned.  Id.  The debtor proposed a "dirt-for-debt" swap

in which it proposed to surrender a number of duplex units — each of which with a proposed value of $52,500 — approximately equal to the indebtedness. Id. The parties stipulated that the balance of the debt was $573,507.32 and, as such, the debtor proposed to surrender 11 units (11 x $52,500.00 = 577,500.00) to the creditor in full satisfaction of its claim. Id. The creditor voted to reject the plan and filed an objection to confirmation. Id. The debtors filed a motion seeking confirmation of the plan under the Bankruptcy Code's "cram-down" provision, arguing that surrender of the eleven duplex units would provide the creditor with the "indubitable equivalent" of its claim. Id. at 835. At the hearing, the parties' appraisers generally agreed that $52,500 per unit was an appropriate "retail" price for any given unit, but the creditor's appraiser testified as to what an investor would pay if he purchased all fourteen units together in a single package. Id. The creditor's appraiser took into account the holding costs that such an investor would incur in holding and marketing the units, and he concluded that the value of the fourteen units was $627,223.00, or $44,801.64 per unit. Id. In light of this valuation, the Bankruptcy Court stated that the creditor remained oversecured — $627,223.00 in collateral versus a debt of $573,507.32. Id. at 836. As such, under the debtor's plan, the debtor would only need to surrender 13 of the 14 units (13 x $44,801.64 = $582,421.32) to satisfy its debt of $573,507.32. Id. The creditor argued that a surrender of less than all of the units, even under the valuation adopted by the court, does not provide it with the "indubitable equivalent" of its claim, id., but the Bankruptcy Court rejected this argument. The Bankruptcy Court stated, "if a reorganization plan proposed to satisfy an allowed secured claim with anything other than the secured creditor's collateral, a court must examine (1) whether the substituted collateral is completely compensatory and (2) the

likelihood that the secured creditor will be paid." Id. at 838 (citation omitted). Thus, "a debtor may substantively alter the rights that a secured creditor otherwise enjoys in its collateral under state law, as long as the creditor receives the 'indubitable equivalent' of its secured claim." Id. The bankruptcy court in In re May concluded that "Debtors are able, if they choose to amend their plan, to sustain their burden of proving that surrender of thirteen of the fourteen" units provides the creditor with the indubitable equivalent of its claim of $573,507.32. Id. at 840. Again, the court valued the thirteen units at $582,421.32, which left under $10,000 of wiggle room.

Second, in In re Riddle, the bank rejected the debtor's proposed Chapter 11 plan and objected to its confirmation. 444 B.R. at 682. The bank was the holder of a claim in the amount of approximately $907,000, secured by a first priority deed to secure debt on approximately 36 acres of real property referred to as the "Highway 411/Dodd Blvd Property" and a second priority deed to secure debt on a condominium unit referred to as the "Heritage Square Property." Id. at 683. The debtor's plan proposed to transfer the Highway 411/Dodd Blvd Property, which the debtor contended was worth $1.2 million, to the bank in full satisfaction of the bank's claim, thereby requiring cancellation of both the second priority deed on the Heritage Square Property and a judgment lien, which the bank also held. Id. The debtor requested that the bankruptcy court confirm the plan under the Bankruptcy Code's "cram-down" provision, arguing that the transfer provides the bank with the "indubitable equivalent" of its claim. Id. at 684. The Court heard evidence at a hearing and found that, properly marketed, the Highway 411/Dodd Blvd Property would likely sell for a price in the range of $1.2 million to $1.3 million, and that it would sell for $990,000 at a "fire sale." Id. The court found that selling costs would be

approximately $50,000, and that consequently, the net proceeds realizable from a "fire sale" would be $940,000. Id. To determine what the bank would realize on the property, the court deducted unpaid ad valorem taxes in the amount of $8,981.04. Id. Accordingly, the bank was slated to receive approximately $931,000 from a sale of the Highway 411/Dodd Blvd Property, compared to its debt of approximately $907,000. The court noted that the plan "goes beyond the concept of transferring all of the lender's collateral to it in satisfaction of its secured claim . . . [but] [r]ather, the Plan provides for the Bank to receive only part of its collateral." Id. at 685 (emphasis in original). The theory underlying the debtor's position was that the bank's receipt of the Highway 411/Dodd Blvd Property provides it with enough value to satisfy its claim in full. Id. The bankruptcy court noted that the treatment must be "completely compensatory," and that an equivalent is "indubitable" if "no reasonable doubt exists that the secured creditor will be paid in full." Id. The court concluded that "the transfer of the Highway 411/Dodd Blvd Property to the Bank provides for the realization of the indubitable equivalent of its claim." In pertinent part, the bankruptcy court stated:

> After payment of estimated selling expenses of $50,000 and satisfaction of unpaid ad valorem taxes of approximately $9,000, the remaining proceeds from such a "fire sale" would be $931,000, which is enough for the Bank to receive more than the amount now due (approximately $907,000), plus six months of interest (approximately $21,500 for 180 days at the per diem rate of $119) (a total of $928,500).

Id. at 685-86. In other words, if the bank were not able to liquidate the property within six (6) months, or did so at a value slightly less than $990,000, the bank would not receive the equivalent of its claim. Nevertheless, the court concluded that "no reasonable doubt exists that the transfer of the Highway 411/Dodd Blvd Property to the Bank will result in full payment of its claim." Id. at 686. After the payment of expenses, the expected

proceeds of the sale — assuming a correct valuation — were approximately $24,000 greater than the debt ($931,000 - $907,000 = $24,000).

Finally, in In re Investors Lending Group, LLC, the debtor owed money to Bank of Ozarks, which debt was secured by twelve separate pieces of real property in Chatham County, Georgia.  489 B.R. 307, 309 (Bankr. S.D. Ga. 2013).  The debtor proposed to surrender seven of the twelve pieces of property in full satisfaction of the bank's claim. Id. at 310.  Taking into account principal, accrued interest, appraisal fees, and estimated accrued attorney's fees, the debtor's total indebtedness to the bank was $744,000.  Id. The seven properties that the debtor proposed to transfer had an aggregate value of $752,000.[17]  Id.  The Bankruptcy Court noted that the debtor's plan was a "'partial dirt-for-debt' plan in which Debtor will surrender certain collateralized property to provide [the bank] with the indubitable equivalent of its claim."  Id. at 312.  "Precedent in 'dirt for debt' cases, however, has to be considered and it generally leads to the conclusion that if a Plan is to be confirmed which approves 'dirt-for-debt' or 'partial dirt for debt,' the decision must be so conservatively or sparingly applied as to ensure that the lender forced over its objection to accept property in satisfaction of a claim receives the indubitable equivalent of cash."  Id. at 314.  The court concluded that, in order to sell the property at

---

[17] The court held that the bank was judicially estopped from asserting that the valuation was not the result of what the court considered to be the proper appraisal standard, liquidation or foreclosure value. Id. at 313-14. To reach this conclusion, the In re Investors Lending Group, LLC court principally relied on the Supreme Court's decision in Rash which, as explained supra note 14, is inapplicable here.  As discussed earlier, courts have disagreed over how best to value property conservatively, In re Stockbridge Properties I, Ltd., 141 B.R. at 472 (stating that "[t]he court finds that the most appropriate method for valuing the outparcels is fair market value," but deducting reasonable holding and market costs), and the Bankruptcy Court's conservative valuation here is not clearly erroneous, see supra Part III(A).

the price contemplated by the appraisal, not only would the property be subject to a three-to-six month holding period, "but would be subject to an eight percent reduction in the net amount received by the lender on account of a typical realtor's commission and the expected closing costs that would be imposed on [the bank] as seller." Id. at 315. The aggregate value of the seven properties was $752,000 and the bank's claim was $744,000. Therefore, in order for the Plan to provide the bank with the "indubitable equivalent" of its claim, confirmation was denied unless the plan was amended to surrender properties totaling $810,000 — $66,000 more than the bank's claim. Id.

Applying the foregoing authorities to the facts of this case, the equity cushion in the Property is more than sufficient to ensure that Farm Credit receives the indubitable equivalent of its claim. Farm Credit stands to receive an equity cushion of approximately $4,653,005 upon receipt of the Property. (First Order, Doc. 1-3 at 19). The evidence supports the Bankruptcy Court's conclusion that this equity cushion will provide Farm Credit with the indubitable equivalent of its claim. The evidence introduced at trial revealed that Farm Credit's liquidation expenses would total approximately 8.1% of the Property's market value. Indeed, a 2009 internal "Real Estate Net Realizable Value Estimate" performed by Farm Credit calculated the Property's "net realizable value" — i.e., the proceeds Farm Credit expected to receive after maintenance, taxes, attorney's fees and costs, and selling costs. See (Debtors'/Guarantors' Trial Exhibit 38). Thus, in 2009, Farm Credit valued the "distressed sale value" of the Property at $24,000,000, and expected to net $22,053,580 from the sale of the Property. (Id.). Farm Credit anticipated expending approximately $1,946,420 to sell the Property. (Id.). In other words, Farm Credit determined that its expenses would equal approximately 8.1% of the Property's

value ($1,946,420 divided by $24,000,000).  (Id.).  This internal report was introduced into evidence at trial, (Transcript of Trial, Doc. 1-84 at 49:24 – 50:8), and the Court finds no merit in Farm Credit's insinuation that the Bankruptcy Court did not consider this evidence, (Reply Brief of Appellant, Doc. 13 at 22).

Using the Bankruptcy Court's valuation of the Property ($30,330,000), 8% of the Property's value would mean that Farm Credit would need to expend approximately $2,426,400 to maintain, market, and sell the Property, which would still leave Farm Credit with a significant equity cushion.  Unlike In re Investors Lending Group, LLC, where the Bankruptcy Court denied confirmation until the plan was amended to provide for an 8% increase to account for the realtor's commission and closing costs, the Plan here makes ample room for costs associated with maintenance, taxes, attorneys' fees, and costs.

Additionally, the valuation accepted by the Bankruptcy Court was premised on the sale of the Property within 12 to 18 months to a single purchaser.  See (Debtors'/ Guarantors' Trial Exhibits 6(a), Doc. 15-1 at 9-10; 6(b), Doc. 15-2 at 9; 6(c), Doc. 15-3 at 9-10) ("An analysis of the sales data included in this report indicates a good demand for this type of property.  Based upon the apparent supply and demand for this type [of] property in the general area, an exposure time of 12 to 18 months is considered appropriate.").  As such, the Bankruptcy Court did not clearly err when it held that "[t]he value of the equity gives Farm Credit a significant amount of time to realize the value of the property."  (First Order, Doc. 1-3 at 19).

Second, Farm Credit argues that the Association is entitled to recover on its claim the attorneys' fees and costs incurred in participating in this bankruptcy case through the

effective date of the Plan, as well as interest that accrued after March 14, 2013.[18] (Appellant's Initial Brief, Doc. 5 at 27 – 28).   Farm Credit argues that these amounts increase Farm Credit's claim by $920,590, which results in a corresponding reduction of the amount of any potential equity cushion in the Property.  (Id.).  The Court finds that (1) Farm Credit's arguments are precluded by the doctrine of invited error, and (2) Farm Credit is left with adequate equity, in any event.

The Court first notes that the attorneys' fees and costs at issue are only those that accrued after March 14, 2013.  Indeed, Farm Credit's claim already includes attorneys' fees and costs through March 14, 2013, (Farm Credit's Trial Exhibit 161); (Appendix, Doc. 11-11), and the Bankruptcy Court awarded Farm Credit its entire claim.  Compare (Objection to Confirmation of Debtor's Chapter 11 Plan or Reorganization, Doc. 1-56 ¶ 14, p. 32) ("As of March 14, 2013, the Association's claim totals $25,676,994.78 . . . ."), with (First Order, Doc. 1-3 at 21) ("The total amount of Farm Credit's claim was $25,676,994.78 as of March 14, 2013.").

On August 26, 2011, Farm Credit filed its proof of claim against Sugarleaf asserting a claim in the amount of $27,310,618.40.[19]  See (Debtors'/Guarantors' Exhibit 79); (Doc. 1-128).   Farm Credit's Claim included the following statement regarding post-petition interest, attorneys' fees, and costs:

> To the extent the value of the collateral securing the claim filed by Farm Credit of Florida, ACA . . . is less than Farm Credit's claim, Farm Credit reserves the right to pursue an unsecured claim, and to the extent the value of the collateral is greater

---

[18] In connection with the Bankruptcy Court's Order imposing a stay pending appeal, Farm Credit waived its right, if any, to claim or recover any interest, attorneys' fees, or costs in connection with Sugarleaf's indebtedness incurred between January 23, 2014 and the disposition of appeals.  See (Stay Order, Doc. 1-11 ¶ 2).

[19] Farm Credit's claim was reduced by post-petition sales of the Property.

> than its claim, Farm Credit reserves its right to collect post-
> petition interest, attorneys [sic] fees and costs pursuant to 11
> U.S.C. Section 506(b).

(Farm Credit's Claim, Debtors'/Guarantors' Exhibit 79 at 3).   Therefore, Farm Credit

contends that it reserved its right to post-petition interest, attorneys' fees, and costs.

(Reply Brief of Appellant, Doc. 13 at 28).   Nevertheless, Farm Credit offered no evidence

at trial regarding attorney's fees or interest that accrued after March 14, 2013.   In fact,

Farm Credit purposefully declined to do so because its litigation strategy was that it was

undersecured and, as such, any discussion regarding attorneys' fees was completely

unnecessary.   In its post-trial brief, Farm Credit stated as follows:

> Any discussion regarding the recovery of attorneys' fees in
> this case is unnecessary for the simple reason that the Debtor
> has failed to provide any evidence whatsoever that the value
> of the Property exceeds the amount of the Association's debt.
> The Association's claim being undersecured, there is no
> possibility to recover attorneys' fees and no further analysis is
> warranted.
>
> . . .
>
> Moreover, proof of attorneys' fees in this proceeding is
> unnecessary given the evidence presented by the Association
> conclusively showing that the value of the Property is less
> than the amount of the Association's debt. As an
> undersecured creditor, the Association is not entitled to
> recover attorneys' fees on its claim so any proof under 506(b)
> is unnecessary. The Association has shown that the Property
> is worth significantly less than the Association' claim so any
> discussion regarding the recovery of attorneys' fees is a waste
> of the Court's time and adds to the fees and expenses each
> party will have to pay its attorneys.

(Farm Credit's Post-Hearing Brief, Doc. 1-73 at 90 - 92) (emphases added).   In other

words, Farm Credit concedes that it purposefully offered no proof of attorneys' fees and

interest accrued after March 14, 2013, but now contends that the Bankruptcy Court erred

in failing to include these unproven amounts in its claim.   Farm Credit invited any error

that occurred, and is precluded from challenging it now. Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC, 684 F.3d 1211, 1231 (11th Cir. 2012) ("A party that invites an error cannot complain when its invitation is accepted."); Ford ex rel. Estate of Ford v. Garcia, 289 F.3d 1283, 1293-94 (11th Cir. 2002) ("It is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party."); see F.T.C. v. AbbVie Prods. LLC, 713 F.3d 54, 65 (11th Cir. 2013) ("[A]s another court of appeals has put it, [invited error] is 'waiver in the truest sense' when a party goes 'beyond failing to raise a relevant argument' and in fact 'affirmatively relie[s] on' a 'standard that they now argue is erroneous.'").

In any event, even if the Court were to find that the Bankruptcy Court committed error in failing to include $920,590 of interest and attorneys' fees, the error is harmless. Carapella v. United States (In re Carapella), 115 B.R. 365, 368 (M.D. Fla. 1990) ("Under the harmless error rule this Court may disregard errors which do not affect substantial rights."); see Fed. R. Bank. P. 9005; Fed. R. Civ. P. 61. Even if the Bankruptcy Court added $920,590 of interest and fees to Farm Credit's claim, Farm Credit still would have an equity cushion in excess of $1.3 million, after deducting $2,426,400 for transaction expenses and marketing costs ($4,653,005 – ($2,426,400 + 920,590) = $1,306,015). Even considering Farm Credit's unproven attorneys' fees and costs, the resulting equity cushion here of more than $1.3 million far surpasses the equity cushion in In re May of under $10,000. Indeed, in In re May, the creditor's claim amounted to $573,507.32, and the Court valued the collateral at $582,421.32. See 174 B.R. at 840. The equity cushion also far surpasses the equity cushion in In re Riddle where, after the payment of

expenses, the expected proceeds of the sale was $24,000 greater than the debt ($931,000 - $907,000 = $24,000). See 444 B.R. at 685-86.

In light of the foregoing, the Bankruptcy Court did not clearly err when it found that "the value of the Property is sufficient to ensure that Farm Credit's secured claim will not be jeopardized, and that Farm Credit will realize the value of its claim." (First Order, Doc. 1-3 at 19). The Court has no reasonable doubt that Farm Credit's claim will be paid in full pursuant to the Plan.

Accordingly, after due consideration, it is **ORDERED**:

1. The Bankruptcy Court's Order on Confirmation of Chapter 11 Plan [Doc. 1-3], entered November 22, 2013, and Order Confirming Debtor's Amended Chapter 11 Plan of Reorganization Dated October 31, 2011 as Modified [Doc. 1-4], entered December 20, 2013, are **AFFIRMED**.

2. Appellant's Request for Oral Argument [Doc. 6] and Appellees' Request for Oral Argument [Doc. 12] are **DENIED as moot**.

3. The Clerk of the Court is **DIRECTED** to transmit a certified copy of this Order to the Clerk of the Bankruptcy Court.

4. The Clerk of the Court is **FURTHER DIRECTED** to enter judgment consistent with this Order, to terminate any pending motions, and to close this case.

**DONE** and **ORDERED** in Jacksonville, Florida this 23ʳᵈ day of March, 2015.

BRIAN J. DAVIS
United States District Judge

mg
***Copies furnished to:***

Counsel of Record

The Honorable Paul M. Glenn,
United States Bankruptcy Judge